JUDGE BRODERICK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**2 0 CV 01450**

| | |
|---|---|
| CCA Civil Panama S.A.,<br><br>        Petitioner,<br><br>        v.<br><br>Green S.A.,<br><br>        Respondent. | Civil Action No. _____ |

### CCA CIVIL PANAMA S.A.'S PETITION FOR A TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF IN AID OF ARBITRATION, AND ORDER COMPELLING ARBITRATION

Petitioner CCA Civil Panama S.A. ("CCA Civil Panama") petitions this Court, pursuant to 9 U.S.C. § 1, *et seq.*, 9 U.S.C. § 201, *et seq.*, and Federal Rule of Civil Procedure 65, for a temporary restraining order, injunctive relief in aid of arbitration, and order compelling arbitration against Respondent Green S.A. ("Green"). In support of its petition, CCA Civil Panama relies on the accompanying Declarations of Dawei Wang, Guillermo Cabanellas, Esq., and Jessica A. Masella, Esq., the exhibits attached thereto, and its memorandum of law, and alleges as follows:

**PRELIMINARY STATEMENT**

1. On or before August 21, 2018, CCA Civil Panama and Green entered into the Term Sheet CCA-Green ("Term Sheet"). The Term Sheet governed CCA Civil Panama's and Green's rights and obligations with respect to CCA Green B S.A. ("SPV"), a special purpose vehicle established exclusively for Argentina's first public-private partnership ("PPP") program. The Term Sheet includes a broad agreement to arbitrate "all controversies." (Exhibit 1, Term Sheet, at

15.) CCA Civil Panama and Green ("the Parties") agree that, to the extent it was not induced by Green's fraud, the Term Sheet is the operative contract and that it is legally binding.

2. On or about September 25, 2019, CCA Civil Panama initiated arbitration proceedings against Green, seeking damages for Green's fraud in inducing CCA Civil Panama to enter into the Term Sheet and Green's material breach of the Term Sheet. The arbitration is pending before the International Chamber of Commerce ("ICC") with New York as the arbitral seat.

3. In the last four months, in direct contravention of the Parties' arbitration agreement, Green filed three civil lawsuits in Argentinian courts against SPV. These lawsuits involve substantially similar issues to those pending before the ICC because the claims stem from the Term Sheet. Green's lawsuits are foreclosed by the Parties' agreement to arbitrate "all controversies" between them. And Green's vexatious litigation tactics in Argentina warrant emergency equitable relief from this Court. Therefore, CCA Civil Panama requests an order compelling Green to arbitrate the disputes underlying its three civil lawsuits.

4. In addition, CCA Civil Panama requests that the Court enjoin Green from pursuing the actions currently pending in Argentina and from bringing any further lawsuits in contravention of the Parties' agreement to arbitrate. Green's lawsuits seem calculated to undermine the ICC arbitration proceeding and CCA Civil Panama's right to arbitrate the Parties' disputes; Green has ignored its contractual agreement to arbitrate in New York notwithstanding its repeated reliance upon the Term Sheet in the civil actions. Green's lawsuits also pose an imminent risk of irreparable harm to CCA Civil Panama's investment in Argentina because of the imminent risk that SPV will lose its contract under the PPP program (SPV's only asset and sole purpose).

**PARTIES**

5.  CCA Civil Panama is a corporation organized under the laws of Panama. Its principal place of business is at Oceania Business Plaza, Tower 1000, 52nd floor, Panama City, Panama.

6.  CCA Civil Panama has significant expertise, dedication, and network capability in the heavy construction industry.

7.  Green is a corporation organized under the laws of Argentina. Its principal place of business is Lateral Sur del Acceso Este 6247 (5523) Jesús Nazareno, Guaymallén, Mendoza, Argentina.

8.  Green is a construction company that operates within Argentina.

**JURISDICTION AND VENUE**

9.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 201, *et seq.* because this action arises under the laws and treaties of the United States.

10. This Court has personal jurisdiction over Green because Green has agreed to arbitrate with New York as the arbitral seat and agreed that New York law would govern the arbitration. (Exhibit 1, Term Sheet, at 15.)

11. Venue is proper in this district because the Term Sheet's dispute resolution clause provides that the arbitral seat is New York, New York. (Exhibit 1, Term Sheet, at 15.)

## **FACTUAL ALLEGATIONS**

### **CCA Civil Panama and Green Participated in Argentina's First Public-Private Partnership Program**

12. In late December 2017, the Argentinian government launched "Safe Highways and Roads Network," the first phase of its public-private partnership ("PPP") program.

13. CCA Civil Panama and Green participated in the tender under the PPP program called the Public National and International Tender for Road Construction Projects in Argentina ("Tender Process").

14. The Argentinian government announced the Tender Process on or about January 26, 2018.

15. During the Tender Process, CCA Civil Panama and Green submitted a joint bid on or about April 24, 2018.

16. In anticipation of winning their bid, CCA Civil Panama and Green jointly established SPV on or about June 7, 2018, in the Province of Mendoza, at Green's request.

17. SPV's sole purpose is to conduct business related to the PPP program.

18. On or about June 18, 2018, the Argentinian government awarded Corridor B—which covers construction, operation, and maintenance of approximately 330 miles of roads and highways connecting Buenos Aires and Santa Rosa (La Pampa)—to CCA Civil Panama and Green. (*See* Exhibit 2, Resolution No. 1,126/2018.)

19. On or about July 31, 2018, SPV entered into a PPP contract with the Argentinian National Road Agency ("Roads Project Contract") in connection with Corridor B's construction, operation, and maintenance.

20. A certified translation of definition 48 and articles 12.2, 21, 58-61, 84-85, 89.1, and 89.4 of the Roads Project Contract is attached as Exhibit 4. Addenda to the Roads Project Contract are attached as Exhibit 5.

21. The Roads Project Contract is SPV's only asset.

22. Under the Roads Project Contract, SPV is required to provide a financial closing guarantee (USD $42,595,223.37), a main works guarantee (USD $10,648,806.23), and a main services guarantee (USD $63,892,835.37) for an initial aggregate amount of USD $117,136,863.91 ("Guarantees"). (Exhibit 3, Roads Project Contract, ch. XVII, arts. 58-61.)

23. Under the Roads Project Contract, SPV is subject to certain nominal capital stock requirements. (Exhibit 3, Roads Project Contract, art. 24.1.)

24. The Roads Project Contract also requires SPV to achieve "financial closing," which will be approved by the Argentinian National Road Agency, before August 31, 2020. (Exhibit 5, June 24, 2019 Amdt. to Roads Project Contract § 3 (modifying the definition of financial closing under Article 1 of the Roads Project Contract).)

25. SPV achieves "financial closing" by securing enough funds to complete the work required by the Roads Project Contract (approximately USD $1,152,200,788.64).

26. The Roads Project Contract's total value represents the amount needed for SPV to build the project, plus the financing cost of capital, taxes, and SPV's profit.

27. Unlike some public works projects, the Roads Project Contract does not provide for payments in advance of work or upon submission of invoices by the contractor. Instead, the Argentinian government will make payments under the Roads Project Contract through the issuance and delivery of securities (*Títulos de Pago de Inversión* or "TPIs").

28. TPIs are securities the Argentinian government will pay on a semi-annual basis over a period of ten (10) years.

29. Under the Roads Project Contract, SPV can achieve "financial closing" through either indebtedness or capital contributions. (Exhibit 3, Roads Project Contract, art. 1 § 48.)

30. If funded through indebtedness, the following requirements must be met: (i) direct or indirect shareholders of SPV, or its affiliates, must commit to make capital contributions in an amount that is at least equal to 0.1% of the TPIs, and (ii) SPV must obtain indebtedness in an amount that, when added to the amount resulting from (i) above, is at least equivalent to 54.1% of the total TPI amount of approximately USD $2.1 billion.

31. If funded through capital contributions, SPV's shareholders or affiliates must commit to make capital contributions in an amount that is at least equal to 54.1% of the total TPI amount of approximately USD $2.1 billion.

32. Specifically, in order to achieve financial closing, SPV needs funds in the amount of USD $1,152,200,788.64 before August 31, 2020.

33. TPIs may be used to obtain financing because TPIs may be used as collateral for financing or for securitization purposes in a capital markets transaction.

34. However, TPIs are deemed securities issued by Argentina that bear the Argentinian government's default risk.

35. Argentina's country risk is now at least 2,000 basis points (20%) more than the United States treasury.

36. At the time of the Tender Process, Argentina's country risk was approximately 450 basis points more than the United States treasury.

37. Because of these economic conditions, shareholders must inject equity or debt into SPV to fund SPV's work in order to achieve financial closing.

38. Funding the SPV's work was specifically discussed by the Parties in negotiating the Term Sheet, and the Term Sheet is the product of those negotiations.

39. In the Term Sheet, CCA Civil Panama and Green agreed to fund SPV until financial closing could be reached.

40. An estimate of USD $250,000,000 was included in the Term Sheet as working capital funds before achieving "financial closing." (Exhibit 1, Term Sheet, equity contribution clause, at 4.)

41. Green was represented by counsel during the negotiation of the Term Sheet. Negotiations over the Term Sheet between the Parties took approximately four (4) months.

## CCA Civil Panama and Green Agreed to Arbitrate All Controversies

42. On or before August 21, 2018, CCA Civil Panama and Green entered into the Term Sheet.

43. The Term Sheet governed the Parties' relationship in connection with SPV's construction, operation, and maintenance of Corridor B.

44. The Term Sheet's dispute resolution clause provides, in full:

> The Parties agree that all controversies (including but not limited to disputes arising in connection with a 'critical decision') shall be amicably resolved but if the Parties are unable to reach any such amicable resolution within 10 consecutive days, they shall submit their dispute to arbitration under ICC rules with the law of the arbitration being New York law and with the seat and venue of the arbitration being New York, New York, USA.

(Exhibit 1, Term Sheet, dispute resolution clause, at 15.)

**Green Misrepresented Its Financial Condition During Negotiations
and Then Failed to Fulfill Its Contractual Obligations**

45. Under the Term Sheet, CCA Civil Panama and Green were both required to contribute to the provision of the Guarantees under the Roads Project Contract. (Exhibit 1, Term Sheet, bonds clause, at 9-10.)

46. Under the Term Sheet, CCA Civil Panama and Green were both required to fund SPV's working capital requirements until financial closing was reached. (Exhibit 1, Term Sheet equity contribution clause, at 4.)

47. CCA Civil Panama was required to furnish 90% of the Guarantees and Green was required to furnish the remaining 10%. (Exhibit 1, Term Sheet, bonds clause, at 9-10.)

48. Unbeknownst to CCA Civil Panama, Green fraudulently concealed its dire financial situation when the Parties negotiated and entered into the Term Sheet.

49. At the time the Parties entered into the Term Sheet, Green lacked the financial strength to enter into an agreement that called for substantial financial expenditures by Green.

50. Green misrepresented its ability to contribute to the Guarantees by misrepresenting that it was a solvent company

51. Green concealed the magnitude of its debt by sending CCA Civil Panama a financial statement that inflated Green's assets and omitted Green's significant debts.

52. Green concealed its dire financial condition to induce CCA Civil Panama to enter into the Term Sheet.

53. Upon information and belief, Green knew before signing the Term Sheet that it would inevitably be forced to breach the Term Sheet.

54. On October 6, 2019, Green filed for insolvency proceedings in Argentina. A court in Mendoza, Argentina, approved the insolvency proceeding on or about October 18, 2019. (Exhibit 6, Court Decision to Open Green's Preventive Restructuring Procedure, at 10.)

55. Green failed to discharge its obligation to contribute to SPV's provision of the Guarantees, putting SPV at risk of losing the Roads Project Contract.

56. Shortly before signing the Roads Project Contract, Green informed SPV and CCA Civil Panama that it would not be able to provide its 10% portion of the Guarantees as required under the Term Sheet. CCA reluctantly allowed for SPV to apply for that portion of the Guarantees, subject to an indemnity letter from Green and an unwritten commitment from Green to replace that portion of the Guarantees, removing risk from the SPV. This portion of the Guarantees had a one year expiration date.

57. During that year, Green's financial situation deteriorated further, rendering any indemnity agreement from it worthless. Not wanting to lose its investment in SPV, CCA Civil Panama took over Green's obligation to furnish the remaining 10% of the Guarantees. (Exhibit 7, Guarantees.)

58. On or about September 12, 2019, CCA Civil Panama sought to terminate the Term Sheet because of Green's fraud-in-the-inducement and, in the alternative, Green's material breach. (Exhibit 8, Letter of Termination dated Sept. 12, 2019 and correspondence among the Parties dated July 2, 2019 and July 15, 2019.)

9

**Green Failed to Secure Funding for Its Commitment to SPV**

59.     Green knew that SPV bore all of the construction, maintenance, and financing risks of the Roads Project Contract.

60.     As explained above, SPV must raise funds in order to perform its contractual obligations including, but not limited to, complying with the work schedule, the capital stock requirements, and the achievement of financial closing.  (Exhibit 3, Roads Project Contract, art. 12.2 & 24.1; Exhibit 5, June 24, 2019 Amdt. to Roads Project Contract § 3 (modifying the definition of financial closing under Article 1 of the Roads Project Contract).)

61.     SPV must also raise funds in order to repay debts to third parties.

62.     SPV needs to be funded with capital injections or loans made by its shareholders or third parties.

63.     SPV attempted to obtain third-party financing.

64.     However, the current state of Argentina's economy and Green's insolvent status limit SPV's access to both local and international lending markets.

65.     Argentina's inflation is hovering around 30%.  (Decl. of Wang, at ¶ 56.)

66.     Argentina's peso (Argentina's currency) has lost two-thirds of its value since 2018.  (Decl. of Wang, at ¶ 57.)

67.     Argentina's financial institutions have taken into account SPV's shareholders' financial status in considering whether to extend loans to SPV.  (Decl. of Wang, at ¶ 58.)

68.     Green's status as an insolvent shareholder deters local financial institutions from extending loans to SPV.  (Decl. of Wang, at ¶ 59.)

69. Because of these obstacles, equity injection by the shareholders is currently the only viable option for SPV to comply with the Roads Project Contract's requirements. (Decl. of Wang, at ¶ 60.)

70. Without equity injections, SPV will not be able to comply with the Roads Project Contract.

71. Without equity injections, the Argentinian government may foreclose upon up to approximately USD $117,000,000 in assets on demand bank-issued stand-by letters of credit that CCA Civil Panama, through itself and its affiliates, put up as collateral.

72. Without equity injections, SPV will suffer termination and foreclosure on Guarantees.

73. SPV's inability to comply with the Roads Project Contract would put public safety in Argentina at risk.

74. SPV's failure to perform under the Roads Project Contract will cause CCA Civil Panama to lose millions of dollars.

### CCA Civil Panama Requested ICC Arbitration

75. On or about September 25, 2019, CCA Civil Panama filed with the ICC Secretariat a Request for Arbitration, seeking damages as a result of Green's fraudulent inducement and material breach of the Term Sheet. (Exhibit 18, Request for Arbitration, at 3-4.)

76. In its Request for Arbitration, CCA Civil Panama argued that New York law applies to the merits of the dispute. (Exhibit 18, Request for Arbitration, at 5.)

77. The Parties are litigating in the ICC arbitration whether the Term Sheet is null and void due to Green's fraud in concealing its dire financial condition before entering into the Term

Sheet and, in the alternative, whether Green materially breached the Term Sheet by its inability to finance SPV's Guarantees.

78. On or about December 17, 2019, Green filed its Answer with the ICC Secretariat. (*See generally* Exhibit 19, Answer to the Request for Arbitration.)

79. Green argued in its Answer that Argentinian law should apply to the merits of the dispute. Green stated that the Term Sheet is still in "full force and effect for the parties." (Exhibit 19, Answer to the Request for Arbitration § IV, ¶ 2.)

80. CCA Civil Panama and Green have appointed Victor Gustavo Parodi and Aida Rosa Kemelmajer de Carlucci as party arbitrators. (Exhibit 18, Request for Arbitration, at 5; Exhibit 19, Answer to the Request for Arbitration, at 1.)

81. Mr. Parodi and Ms. Kemelmajer de Carlucci will select the third neutral arbitrator who will preside over the panel. The chairperson of the tribunal has not yet been appointed.

**Green Filed Three Vexatious Civil Actions in Argentina After
CCA Civil Panama Attempted to Approve Capital Injections into SPV**

82. On or about September 16, 2019, SPV held an extraordinary shareholder meeting.

83. The main agenda item for that meeting was increasing SPV's capital in the amount of USD $25,000,000 (the bare minimum amount needed immediate for the SPV to continue operating at the lowest level under the Roads Project Contract work schedule, although the project will demand more than USD $ 1 billion over the 5-year construction period).

84. The meeting included lengthy discussions and a presentation from SPV's Chief Financial Officer.

85. CCA Civil Panama, the controlling shareholder (with 51% of the shares), approved the capital increase.

86. Green, which owns 49% of SPV's shares, opposed the capital increase at the shareholder meeting.

87. The Term Sheet provides that, as "strategic shareholder," CCA Civil Panama has the ultimate decision-making power to adopt any measure in connection with SPV that it deems necessary. (Exhibit 1, Term Sheet, decision-making process clause, at 6-7.)

88. The Parties included the "strategic shareholder" provision in the Term Sheet to avoid possible deadlocks between the shareholders.

89. On or about October 16, 2019, Green filed a lawsuit in the Commercial Court of Mendoza against SPV.

90. In the suit, Green sought an annulment of the shareholder meeting on September 16, 2019, at which SPV's capital increase was approved. (Exhibit 9, Compl. No. 1, at 2.)

91. In support of its claim, Green argued that SPV's capital increase would dilute Green's shares in contravention of the Term Sheet. (Exhibit 9, Compl. No. 1, at 49-57.)

92. Green has admitted in the Argentinian civil actions that it would be unable to inject the required equity into SPV.

93. On or about October 17, 2019, Green obtained a preliminary injunction from the Commercial Court of Mendoza that prevented CCA Civil Panama from injecting capital into SPV pursuant to the shareholder meeting on or about September 16, 2019. (Exhibit 10, First Preliminary Injunction dated Oct. 17, 2019, at 8-9; *see also* Exhibit 11, Certified translation of First Preliminary Injunction.)

94. On or about October 28, 2019, SPV appealed the preliminary injunction. The appeal is currently pending before the Court of Appeals in Mendoza.

95. The first preliminary injunction remains in effect.

96. On or about December 3, 2019, SPV held another shareholder meeting to increase SPV's capital stock by approximately USD $2.5 million. This was the minimum capital stock required under the Roads Project Contract. This amount does not allow for work progress. CCA Civil Panama again approved the capital increase for SPV.

97. The December 3, 2019 shareholder meeting was precipitated by SPV falling below the minimum contractual capital stock required under the Roads Project Contract.

98. CCA Civil Panama again approved the capital increase for SPV during the December 3, 2019 shareholder meeting.

99. On December 23, 2019, Green filed a second lawsuit in the Commercial Court of Mendoza to seek an annulment of the shareholders' decision. (Exhibit 12, Compl. No. 2, at 1.)

100. On or about December 26, 2019, Green obtained a preliminary injunction in its second civil action in Argentina that prevents the capital injection to SPV pursuant to the decision of the shareholder meeting on December 3, 2019. (Exhibit 13, Second Preliminary Injunction dated Dec. 26, 2019, at 9; *see also* Exhibit 14, Certified translation of Second Preliminary Injunction.)

101. On January 16, 2020, SPV appealed the second preliminary injunction. The appeal is currently pending before the Court of Appeals in Mendoza.

102. The second preliminary injunction remains in effect.

103. On or about February 3, 2020, Green filed a third lawsuit in the Commercial Court of Mendoza to prevent an upcoming SPV shareholder meeting. (Exhibit 15, Compl. No. 3.)

104. On or about February 7, 2020, SPV was scheduled to hold a shareholder meeting where approval of financial statements and a desperately needed capital increase would be discussed.

105. However, the meeting had to be cancelled due to a restraining order ("*Medida Autosatisfactiva*") issued by the Commercial Court of Mendoza on or about February 4, 2020. (Exhibit 16, Restraining Order, at 11; *see also* Exhibit 17, Certified translation of Restraining Order.)

106. This restraining order prevents the shareholders from voting on, or even discussing, any of the relevant items in the shareholder meeting's agenda.

107. This restraining order has brought SPV to a standstill because SPV lacks funds to continue performance under the Roads Project Contract.

108. Green's claims in its civil lawsuits primarily revolve around the Parties' obligations under the Term Sheet.

109. Upon information and belief, Green has not informed the Commercial Court of Mendoza that the ICC arbitration is pending or that the Term Sheet requires arbitration of all controversies between the Parties.

## CLAIM FOR RELIEF

110. CCA Civil Panama incorporates each of the preceding paragraphs of the Petition as if fully set forth herein.

111. Under 9 U.S.C. § 201-206 and Federal Rule of Civil Procedure 65, this Court may simultaneously compel arbitration and issue injunctions in aid of arbitration.

112. Under the Term Sheet, CCA Civil Panama and Green are required to litigate in ICC arbitration any disputes that cannot be resolved amicably.

113. An anti-suit injunction and an order compelling Green to arbitrate its disputes in arbitration are warranted here because Green's Argentinian lawsuits contravene the Term Sheet's dispute resolution clause.

114. In breach of the Term Sheet, Green brought three lawsuits against SPV in Argentinian courts.

115. SPV is a majority-owned subsidiary of CCA Civil Panama and an active participant in the business relationship arising from the Term Sheet.

116. The litigants to Green's three lawsuits in Argentina are identical to or substantially similar to the litigants in the present action.

117. Green's lawsuits relate to the shareholders' decisions approving capital stock increases in SPV and obtaining funding for SPV.

118. The broad arbitration agreement in the Term Sheet covers Green's lawsuits pending before the Argentinian courts.

119. Because the arbitration agreement covers the matters before the Argentinian courts, an order by this Court compelling arbitration of the Argentinian civil actions and enjoining Green from continuing the lawsuits will be dispositive of the Argentinian civil actions.

120. Allowing Green to continue pursuing the Argentinian civil actions would frustrate the long-standing federal policy in favor of arbitration, threatens this Court's jurisdiction, and is not equitable.

121. Allowing Green to continue pursuing the Argentinian civil actions is likely to result in inconsistent judgments concerning the status of the Term Sheet because the Argentinian courts are unlikely to apply New York law as required by the dispute resolution clause.

122. Green's decision to pursue parallel litigation in Argentina while arbitrating the same issues in New York is vexatious and imposes unreasonable and unnecessary costs. (Decl. of Wang, at ¶ 93.)

123. Unless Green is enjoined from continuing its civil actions in Argentina, CCA Civil Panama will face immediate and irreparable harm through the loss of its contractual right to submit "all controversies" between the Parties to ICC arbitration.

124. CCA Civil Panama has no adequate remedy at law.

125. By commencing the Argentinian actions, Green has rendered SPV undercapitalized.

126. The three preliminary injunctions that Green obtained have rendered SPV in breach of the Roads Project Contract.

127. SPV may lose the Roads Project Contract, which is worth approximately USD $2.1 billion, due to SPV's undercapitalization. (Decl. of Wang, at ¶ 94.)

128. SPV's undercapitalization may trigger the Argentinian government's right to execute the Guarantees that have been provided by CCA Civil Panama. (Decl. of Wang, at ¶ 95.)

129. Emergency relief from the Court is requested because of Green's vexatious litigation tactics in Argentina and to ensure SPV remains in compliance with the Roads Project Contract.

## **PRAYER FOR RELIEF**

WHEREFORE, CCA Civil Panama respectfully requests that the Court enter an order:

(a)   Temporarily restraining Green from enforcing the Argentinian injunction orders;

(b)   Directing Green to (i) request immediate vacatur of the Argentinian injunctions and/or any other related injunction granted by any Argentinian court purporting to enjoin CCA Civil Panama from taking any steps to raise SPV's capital stock, and (ii) refrain from enforcing the Argentinian injunctions while they remain in effect;

(c) Compelling Green to dismiss, or cause to be dismissed, the civil actions currently pending in Argentina that raise claims relating to the Term Sheet;

(d) Enjoining Green from bringing any dispute that falls within the scope of the Term Sheet's dispute resolution clause in any forum besides ICC arbitration seated in New York, New York;

(e) Compelling Green to arbitrate the claims that are currently pending in the Argentinian lawsuits;

(f) Granting CCA Civil Panama its costs and disbursements of this action, including its reasonable attorneys' fees; and

(g) Granting such other, further, or different relief as the Court deems just and proper.

Dated: February 19, 2020
New York, New York

Respectfully submitted,

/s/ Kevin Walsh
Kevin Walsh
Jessica A. Masella
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500
kevin.walsh@dlapiper.com
jessica.masella@dlapiper.com

Courtney G. Saleski (*pro hac vice* application to be submitted)
DLA PIPER LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
(215) 656-3300
courtney.saleski@dlapiper.com
*Attorneys for CCA Civil Panama S.A.*